COMPUSERVE, INC., Appellant,

v.

LIMBACH, TAX COMMR., Appellee.

[Cite as *Compuserve, Inc. v. Limbach* (1994), 93 Ohio App.3d 777.]

Court of Appeals of Ohio,
Franklin County.

No. 93AP–1055.

Decided March 24, 1994.

*Bricker & Eckler, Charles F. Glander* and *Mark A. Engel,* for appellant.

*Lee Fisher,* Attorney General, and *James C. Sauer,* Assistant Attorney General, for appellee.

PETREE, Judge.

This appeal arises out of a sales and use tax assessment issued against the appellant-taxpayer, Compuserve, Inc. ("Compuserve"). Compuserve presents three assignments of error for our review:

"I.   The Board determined that fewer than all of Appellant's computer mainframes were primarily used directly in making taxable retail sales of computer services to businesses.

"II.   The Board determined that fewer than all of the assessed computer and network system parts were purchased for use in making retail sales of computer services to businesses and, therefore, fewer than all of them were excepted from the imposition of sales and use taxes pursuant to R.C. 5739.01(E)(2) and 5741.-02(C)(2).

"III.   The Decision and Order of the Board [are] against the manifest weight of the evidence."

Since all of Compuserve's assignments of error are interrelated and give rise to a single issue for review, this opinion will be directed to a determination of that issue, which has been succinctly stated by Compuserve:

"Whether the Board of Tax Appeals reasonably and lawfully determined that the computer mainframes were not primarily used directly in making retail sales, such that computer and network repair parts and components were not excepted from sales and use tax[es] pursuant to R.C. 5739.01(E)(2)."

Compuserve, an Ohio-based corporation, is a wholly owned subsidiary of H & R Block providing customer access to its established network of hardware, dedicated telephone lines, and software. It does not provide batch processing or automatic data processing to its customers.

The record indicates that Compuserve began its business by selling raw computer time to business clients. Compuserve provided the hardware on which these clients could run their own software programs in order to process business data. At that time, Compuserve was using a computer system called the DEC 10 system, which consisted of a central processing unit (or mainframe) which manipulated the data, a temporary storage device for data memory, permanent disk storage devices, and magnetic tape drives used to bring data back and forth from the customer sites. Compuserve provided this data manipulation service exclusively to business clients.

In the mid–1970s, Compuserve began offering its own solutions to business clients' problems by providing its own applications software. This service, too, was offered exclusively to business clients and became known as "Business Information Services" or "BIS." This service became available at 6:00 a.m. EST and continued for business use until 12:00 p.m. EST. Between midnight and 6:00 a.m., all in-house computer functions were scheduled, including corrective maintenance on the hardware, back-up of customer data, and "refreshing" of the system.

In the early 1980s, Compuserve found that it had a great deal of excess computer time available in the early evening, at night, and on weekends, and began to seek ways in which it could leverage its hardware expense during these idle times. Compuserve decided to make some of the software packages that were available to businesses available to individual home computer users during these idle hours. Typically, one disk drive containing a subset of the software available to businesses was put on line at 6:00 p.m. for use by these individual customers. By contrast, a system used by a business customer typically involved ten to twelve disk drives, with some larger clients using up to twenty-five disk drives.

This new service was called "Customer Information Services" or "CIS," and was available between 6:00 p.m. and midnight to both business and individual clients. Individuals were charged at a rate of $6 per hour for CIS, while businesses were charged at a rate of $12 per hour for the same service.

In order to further leverage its hardware investment, Compuserve offered customers the opportunity to use its network hardware to interconnect their own computer hardware at remote locations. Using the network, customers could transmit data between their own computers without going through Compuserve's host mainframe processors in Columbus. This service was available exclusively to business customers.

Subsequent to the enactment of Am.Sub H.B. No. 291, effective July 1, 1983, the Department of Taxation excepted from taxation those purchases of computer hardware used to provide business information services. Because the provision of computer services to business customers became a taxable transaction under R.C. 5739.01(B)(3)(e), the acquisition of equipment used to render these taxable services could be made without paying sales or use tax. By contrast, the provision of computer services to nonbusiness customers remained nontaxable; therefore, the acquisition of equipment used to render these nontaxable services remained subject to sales or use tax.

During the audit period, which ran from July 1, 1983 through April 30, 1986, all three previously noted types of services were provided by Compuserve. In other words, Compuserve rendered some taxable and some nontaxable services.

During the audit, the tax agent, Douglas Agler, discovered that Compuserve did not maintain a Consumer's Use Tax Account and that, as a result, Compuserve had paid virtually no tax on any purchases of computer hardware. Because the agent recognized that some of Compuserve's purchases were taxable and others were not, he decided that the primary use of the mainframe and network must be determined in order to assess Compuserve's tax liability.

The agent met with Joseph Rutherford, his contact at Compuserve on several occasions, to discuss the issue of primary use. Because the invoices for computer equipment purchased contained no delineation as to whether the equipment was purchased for BIS or CIS use, the agent requested that Compuserve produce any secondary records that would give a breakdown of how many computer mainframes were used in rendering BIS and CIS. After several such requests, Rutherford produced an undated "management report," which is summarized as follows:

|  | HOSTS |
|---|---|
| BIS only | 3.0 |
| BIS & CIS | 13.5 |
| CIS only | 10.0 |
| Customers: | 26.5 |
| Admin | 3.5 |
| Inhouse (dev) | 4.0 |
| Engineering | 2.0 |
| Internal support: | 9.5 |

| | |
|---|---|
| Out of service | 2.0 |
| Inventory | 6.0 |
| Spare capacity: | 8.0 |

Using this report, the agent determined that sixteen (BIS only and BIS & CIS) of the forty-four mainframes were used primarily for BIS and were therefore used for nontaxable purposes. Thus, he determined that 36.36 percent of the mainframes were used directly in making retail sales to businesses, and were thus exempt from taxation under R.C. 5739.01(E)(2). He then proposed that a three-month test check of certain expense accounts be performed in order to determine that percentage of taxable purchases on which Compuserve had paid no tax. The 36.36 percent figure was applied to total purchases for the entire audit period in order to determine Compuserve's total tax liability. The agent determined that the remaining twenty-eight mainframes were put to taxable uses, and thus included 63.64 percent of the purchases as being subject to sales or use tax. He further determined that all of the repair parts for the network were taxable, as the majority usage of the network was in providing a service.

The agent prepared a "Memorandum of Agreement" ("agreement") and presented it to Compuserve's authorized representatives for approval and signature. The agreement, dated January 20, 1987, was signed by the agent and by Thomas J. Carr, Compuserve's Controller. The agreement stated that Compuserve had agreed to apply the 36.36 percent calculation to a sampling of certain of Compuserve's accounts in order to determine Compuserve's total tax liability. The agreement further stated that it did "not constitute an admission of any tax liability or a waiver of taxpayer's right to appeal the tax assessment, however, it does represent an agreement to the procedures set forth above."

Using the method and procedures outlined in the agreement, the agent determined an assessment amount relative to the entire audit period. A preliminary assessment was issued, to which Compuserve objected. On petition for reassessment, the Tax Commissioner reduced the amount of tax assessed and conditionally remitted a portion of the penalty.

Compuserve appealed the Tax Commissioner's final determination to the Board of Tax Appeals ("BTA"). Following an evidentiary hearing and the submission of briefs, the BTA affirmed the final determination of the Tax Commissioner. Compuserve has timely appealed the BTA's decision.

Compuserve asserts that the BTA's decision is unreasonable and unlawful in that it fails to discuss the issue of primary use of the computers and also fails to consider the evidence submitted with respect to that issue. Compuserve further contends that the evidence in the record conclusively establishes that Compu-

serve's primary use of the mainframes was in rendering taxable sales of computer services to businesses and, as a result, all repair parts and components should have been excluded from sales or use tax pursuant to R.C. 5739.01(E)(2).

R.C. 5717.04 sets forth this court's standard of review for appeals from the BTA and provides that, if upon hearing and consideration of such record and the evidence, this court determines that the decision of the BTA appealed from is reasonable and lawful, it shall be affirmed. If this court decides that the decision of the BTA is unreasonable or unlawful, we shall reverse and vacate the decision, or modify it, and enter final judgment in accordance with the modification.

█ Pursuant to R.C. 5739.02, all retail sales are presumed to be taxable. During the audit, R.C. 5739.01 provided, in part:

"(B) 'Sale' and 'selling' include all of the following transactions for a consideration in any manner, whether absolutely or conditionally, whether for a price or rental, in money or by exchange, and by any means whatsoever:

" * * *

"(3) All transactions by which:

" * * *

"(e) Automatic data processing and computer services are or are to be provided for use in business * * *.

" * * *

"(E) 'Retail sale' and 'sales at retail' include all sales except those in which the purpose of the consumer is:

" * * *

"(2) * * * [T]o use or consume the thing transferred * * * directly in making retail sales * * *."

Also in effect during the audit period was a rule that provided that computer hardware used in rendering computer services to businesses is used directly in making retail sales, and is therefore excepted from taxation pursuant to R.C. 5739.01(E)(2). Ohio Adm.Code 5703–9–46(E)(1).

█ Because the equipment purchased in the instant case is put to both taxable and nontaxable uses, the primary use of the equipment must be established in order to determine whether or not it is exempt from taxation. As the Supreme Court stated in *Mead Corp. v. Glander* (1950), 153 Ohio St. 539, 543, 42 O.O. 24, 27, 93 N.E.2d 19, 21:

"The general rule is that 'it is the primary, as distinguished from an incidental, use of the property that determines the question whether it is exempt from taxation.' * * * "

It is therefore incumbent upon the BTA to consider the primary use of purchased equipment in order to determine its taxability. *SFZ Transp., Inc. v. Limbach* (1993), 66 Ohio St.3d 602, 613 N.E.2d 1037. The primary use test is articulated in paragraph two of the syllabus of *Ace Steel Baling v. Porterfield* (1969), 19 Ohio St.2d 137, 48 O.O.2d 169, 249 N.E.2d 892:

"The 'primary use' of an item of equipment, for the purposes of taxing, or excepting from tax, its sale or use under Sections 5739.02 and 5741.02, Revised Code, is not to be determined solely from a measure of the relative time it is utilized in a taxable and a nontaxable capacity but also from the value of its direct contribution to the product which is processed."

*Ace Steel Baling* further states, 19 Ohio St.2d at 140–141, 48 O.O.2d at 171, 249 N.E.2d at 895, that " '[p]rimary use' connotes primacy in utility or essentiality, in quality as well as quantity."

Compuserve argues that the BTA did not discuss the primary use test as articulated in *Ace Steel Baling,* nor did it discuss relevant case law or the factors to be considered in determining primary use. We find that this argument lacks merit. Although the BTA cited no specific cases that discuss primary use, the BTA's decision is replete with references to the primary use of Compuserve's mainframes and related hardware. It is clear from its decision that the BTA understood that its function was to determine the primary use of Compuserve's purchases in order to determine their taxability.

Compuserve further argues that the BTA based its decision solely on one piece of evidence before it—the undated "management report" submitted by Compuserve to the agent upon his request for some way of determining the hardware's primary use. Compuserve argues that this "management report" provides only a "snapshot" of computer mainframe use at a particular moment in time, and was not representative of mainframe usage throughout the entire audit period. However, the BTA determined that Compuserve did not adequately explain why it did not supply the agent with a more timely and accurate report, or why it did not produce a more accurate record of hardware usage at the time of the hearing in order to determine the primary use of the mainframes and related hardware.

At the hearing, Compuserve produced an employee witness who testified that Compuserve's mainframes were not designed for any one particular use, and that use of the equipment shifted between providing CIS and BIS based upon customer needs. The witness also testified that when demand exceeded capacity, CIS services were suspended, as BIS was considered the real mainstay of

Compuserve's business. However, the BTA correctly noted that Compuserve did not cite any specific instances in support of these general allegations.

■ Compuserve further argues that the BTA ignored evidence offered at the hearing with regard to revenues generated from CIS and BIS. Compuserve contends that because BIS generated more revenue than CIS over the entire audit period, this evidence conclusively established that BIS was the primary use of mainframe- and hardware-related purchases. Contrary to Compuserve's assertion, we find that the BTA did indeed consider the revenue evidence submitted by Compuserve. The BTA conceded that revenue is an important consideration in determining primary use of the equipment; however, the BTA correctly determined that the fact that revenue derived from BIS exceeded revenue derived from CIS did not conclusively establish the primary use of the hardware, especially in light of the "management report" provided by Compuserve, which clearly indicated that more mainframes were dedicated to nontaxable uses than to taxable uses. The BTA cited the fact that Compuserve charged more for BIS than for CIS as one explanation for the revenue disparity. The BTA further recognized that there was substantial use of the mainframes in providing internal support and spare capacity from which no revenue was generated.

The BTA has wide discretion in considering the weight of the evidence and the credibility of the witnesses before it. *Cardinal Fed. S. & L. Assn. v. Cuyahoga Cty. Bd. of Revision* (1975), 44 Ohio St.2d 13, 73 O.O.2d 83, 336 N.E.2d 433. It is not the function of a reviewing court to sit as a trier of fact *de novo*. *Youngstown Sheet & Tube Co. v. Mahoning Cty. Bd. of Revision* (1981), 66 Ohio St.2d 398, 20 O.O.3d 349, 422 N.E.2d 846. The BTA correctly found that Compuserve had an affirmative duty to establish its right to a claimed exception, *Bird & Son, Inc. v. Limbach* (1989), 45 Ohio St.3d 76, 78, 543 N.E.2d 1161, 1163, but found that the evidence presented by Compuserve regarding sales revenues and use of the mainframes was insufficient to overcome the presumption of taxability. While we are mindful that were are not obligated to defer to the BTA's determination of credibility or weighing of the evidence, *SFZ, supra,* 66 Ohio St.3d at 605, 613 N.E.2d at 1040, we cannot say that the BTA's decision is either unreasonable or unlawful.

For the foregoing reasons, Compuserve's assignments of error are overruled, and the order of the Board of Tax Appeals is hereby affirmed.

*Decision affirmed.*

Bowman and Strausbaugh, JJ., concur.

Dean Strausbaugh, J., retired, of the Tenth Appellate District, sitting by assignment.